**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2344-20

TIVON NEALS,

     Appellant,

v.

NEW JERSEY DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____

Submitted September 20, 2022 – Decided October 18, 2022

Before Judges Sumners and Susswein.

On appeal from the New Jersey Department of Corrections.

Tivon Neals, appellant pro se.

Matthew J. Platkin, Acting Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Christopher C. Josephson, Deputy Attorney General, on the brief).

PER CURIAM

State prison inmate Tivon Neals appeals from a final agency decision by the Department of Corrections (DOC) affirming his administrative conviction for refusing to submit to mandatory COVID-19 testing. Neals argues that DOC violated his due process rights, contending that he could not be found guilty of violating prison rules and regulations because COVID-19 testing was not required by statute, regulation, or court order, and he was not provided with written notice that such testing was mandatory. Neals also argues that his administrative conviction was not supported by substantial evidence. After carefully reviewing the record, we affirm the agency decision.

I.

We discern the following pertinent facts and procedural history from the record. On March 10, 2021, Assistant DOC Commissioner Willie Bonds sent an e-mail to DOC administrative staff with the subject line "COVID Test Refusals." That email explained DOC's mandatory COVID-19 testing program and the consequences of refusing a COVID-19 test. The e-mail stated:

> In order [to] ensure department-wide consistency and protect effectiveness of our mandatory COVID testing program the following steps will be taken when an inmate refuses his/her COVID test:
>
> 1. The inmate will be counseled by Medical staff regarding the purpose of the test and address any medical questions or concerns the inmate may have.

> 2. If the inmate still refuses they are to be issued a direct order by Custody staff to submit to the test.
>
> 3. If the inmate still does not comply they will be placed in Quarantine status for a 14-day period, and issued a .260 disciplinary charge for refusing to submit to mandatory medical or other testing such as, but not limited to, mandatory testing required by law or court order.

On March 11, 2021, Nurse Supervisor Scarborough informed Neals that COVID-19 testing was required and that he could no longer sign a waiver to decline testing as had been previously allowed. When asked if he would submit to testing, Neals initially responded that he would first have to check with his attorney. Nurse Scarborough counseled Neals regarding refusal to submit to testing and explained the purpose of quarantine housing. Lieutenant Boyle also informed Neals that the COVID-19 saliva test was mandatory and again asked him whether he would take the test. Neals "verbalized understanding and advised that he would submit to testing."

Later that day, Nurse Frederic-Caldwell went to Neals's housing wing to administer the test, but Neals refused. Neals signed a refusal form. Due to his refusal to submit to COVID-19 testing, Neals was placed in quarantine and charged with committing a violation of N.J.A.C. 10A:4-4.1(a)(2)(xxviii)

(*.260),[1] refusing to submit to mandatory medical or other testing such as, but not limited to, mandatory testing required by law or court order.

On March 12, 2021, Sergeant Daley served the charge on Neals, conducted an investigation, and referred the charge to a hearing officer for further action. Neals requested and was granted the assistance of a counsel substitute. The disciplinary hearing was convened on March 16, 2021, at which Neals pled not guilty. Neals's counsel substitute submitted a written statement requesting dismissal of the charge, arguing that the record did not indicate that COVID-19 testing was in fact mandatory and thus Neals could not commit a violation of refusing mandatory testing. Neals gave a statement at the hearing asserting that "[a]ll [he] wanted was something in writing," and that he had "no problem complying with the written rule if there is a written rule." Neals was offered but declined the opportunity to call witnesses on his behalf at the hearing. He was also offered but declined the opportunity to confront adverse witnesses.

---

[1] This infraction is an "asterisk offense." "Under DOC regulations on inmate discipline, N.J.A.C. 10A:4-4.1, '[a]sterisk offenses' are prohibited acts considered to be the most serious violations, resulting in the most severe sanctions." Hetsberger v. Dep't of Corr., 395 N.J. Super. 548, 556 (App. Div. 2007).

A-2344-20

The hearing officer found Neals guilty and sanctioned him to forty-five days in the Restorative Housing Unit and thirty days loss of recreation privileges. In finding Neals guilty, the hearing officer relied on reports submitted by Lieutenant Boyle and Nurse Scarborough, as well as the email from Assistant Commissioner Bonds. The hearing officer noted that Neals offered no evidence to discredit the staff reports. The hearing officer also considered but rejected the argument set forth in the written statement submitted by Neals's counsel substitute.

Neals administratively appealed the hearing officer's decision. On March 17, 2021, Assistant Superintendent Russo upheld the guilty finding and the sanctions imposed. Assistant Superintendent Russo determined that "there was compliance with [the] Title 10A provision on inmate discipline which prescribe[s] procedural due process safeguard[s]." He also concluded that there was substantial evidence to support the hearing officer's findings and that the sanctions were appropriate for the infraction. Neals's request for a reduced or suspended sanction, as well as his plea of leniency, were denied.

This appeal follows. Neals raises the following contentions for our consideration:

A-2344-20

POINT I

THE AGENCY'S FINDING OF GUILT SHOULD BE VACATED AND DISMISS[ED] FOR FAILURE TO PROVIDE APPELLANT WRITTEN NOTICE WHERE NO STATUTE, REGULATION, OR COURT ORDER MANDATED WEEKLY SALIVA TESTS FOR INMATES.

POINT II

THE AGENCY'S FINDING OF GUILT SHOULD BE VACATED AND DISMISS[ED] WHERE THE HEARING OFFICER DID NOT IDENTIFY SUBSTANTIAL EVIDENCE APPELLANT REFUSED TO SUBMIT TO A MANDATED WEEKLY COVID-19 SALIVA TEST.

II.

We begin our analysis by acknowledging the legal principles governing this appeal. The scope of our review is narrow. We will disturb an agency's adjudicatory decision only upon a finding that the decision is "arbitrary, capricious or unreasonable," or is unsupported "by substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579–80 (1980) (citing Campbell v. Dep't of Civ. Serv., 39 N.J. 556, 562 (1963)). In determining whether an agency action is arbitrary, capricious, or unreasonable, a reviewing court must examine:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency

6

follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[In re Carter, 191 N.J. 474, 482–83 (2007) (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

In an appeal from a final decision in a prisoner disciplinary matter, we consider whether there is substantial evidence in the record to support the department's decision that the inmate committed the prohibited act. Blanchard v. N.J. Dep't of Corr., 461 N.J. Super. 231, 237–38 (App. Div. 2019) (citing Henry, 81 N.J. at 579–80 (1980)). "Substantial evidence has been defined alternately as 'such evidence as a reasonable mind might accept as adequate to support a conclusion,' and 'evidence furnishing a reasonable basis for the agency's action.'" Id. at 238 (quoting Figueroa v. N.J. Dep't of Corr., 414 N.J. Super. 186, 192 (App. Div. 2010)); see also N.J.A.C. 10A:4-9.15(a) ("A finding of guilt at a disciplinary hearing shall be based upon substantial evidence that the inmate has committed a prohibited act.").

The adjudicative determinations of an administrative agency are entitled to deference and "carry with them a presumption of reasonableness." Figueroa, 414 N.J. Super. at 191. "An appellate court may not reverse an agency's

determination 'even if [the] court may have reached a different result had it been the initial decision maker.'" Ibid. (quoting Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009)). However, "our review is not 'perfunctory,' nor is 'our function . . . merely to rubberstamp an agency's decision.'" Blanchard, 461 N.J. Super. at 239 (quoting Figueroa, 414 N.J. Super. at 191). Rather, "[w]e are constrained to engage in a 'careful and principled consideration of the agency record and findings.'" Ibid. (quoting Williams v. N.J. Dep't of Corr., 330 N.J. Super. 197, 204 (App. Div. 2000)).

Our deference to the adjudicatory decisions made by DOC is especially appropriate in view of that agency's important mission to protect the health, safety, and welfare of inmate populations, as well as ensuring the safety of all individuals within DOC facilities. See Russo v. N.J. Dep't of Corr., 324 N.J. Super. 576, 584 (App. Div. 1999) ("Prisons are dangerous places, and the courts must afford appropriate deference and flexibility to administrators trying to manage this volatile environment."). DOC has a compelling interest in controlling the spread of COVID-19 by detecting and isolating inmates who are infected with the virus.

As our Supreme Court made clear in Avant v. Clifford, inmates are afforded due process rights in disciplinary proceedings. 67 N.J. 496, 525–33

8

(1975); see also McDonald v. Pinchak, 139 N.J. 188, 193–94 (1995).  As the Supreme Court noted in McDonald, the regulatory framework for adjudicating charges "strike[s] the proper balance between the security concerns of the prison, the need for swift and fair discipline, and the due process rights of the inmates."  139 N.J. at 202.

In Avant, the Court stressed that "[t]he first requirement of procedural due process is notice," both of specific violations and "general notice of prison rules, offenses, sanctions."  67 N.J. at 525.  Such general notice is afforded by means of the Handbook on Discipline that is provided to each inmate upon his or her reception into the prison system.  N.J.A.C. 10A:4-2.1(a).  Inmates are thereby "advised in writing of their rights and responsibilities, the acts and activities which are prohibited, the rules which must be followed and the disciplinary process within the correctional facilities of the Department of Corrections." Ibid.  The regulation further provides that, when changes are made to the disciplinary rules, notice must be provided by means of written postings "in housing units and other areas of the correctional facility," and the changes shall be "incorporated into the next revision of the Handbook on Discipline and when appropriate, in the correctional facility Inmate Handbook."  N.J.A.C. 10A:4-2.1(c).

A-2344-20

The Inmate Discipline Program, established in N.J.A.C. 10A, identifies specific prohibited acts and provides a schedule of sanctions for violations of the rules. See N.J.A.C. 10A:4-4.1(a). The rule at issue in this case is codified at N.J.A.C. 10A:4-4.1(a)(2)(xxviii) (*.260), which requires inmates to "submit to mandatory medical or other testing such as, but not limited to, mandatory testing required by law or court order." Ibid. (emphasis added).

### III.

We first address Neals's contention that DOC violated his due process rights by sanctioning him for refusing to submit to COVID-19 testing because such testing was not explicitly required by statute, regulation or court order, and because inmates did receive written notice that such testing was mandatory. These arguments lack merit. We agree with DOC that COVID-19 testing of inmates was mandatory, at least as of March 10, 2021, as reflected in Assistant Commissioner Bonds's e-mail to DOC staff. DOC staff verbally informed Neals that testing was mandatory prior to his refusal and charging him with prohibited act *.260. Neals was counseled regarding the purpose of mandatory testing as well as the consequences of his refusal. That was sufficient to provide notice to Neals that COVID-19 testing constituted "mandatory medical testing" for purposes of N.J.A.C. 10A:4-4.1(a)(2)(xxviii) (*.260).

The plain text of the rule makes clear that the requirement to submit to mandatory testing is not limited to testing required by law or court order. N.J.A.C. 10A:4-4.1(a)(2)(xxviii) (*.260). There is no requirement that DOC adopt a rule or regulation that is specific to each type of medical test that may be administered to inmates. Nor is there a requirement in the regulation that inmates receive written notice of each mandated test. It was sufficient that Neals was verbally informed that COVID-19 testing was a mandatory medical test. We thus conclude that the administrative prosecution for violation of N.J.A.C. 10A:4-4.1(a)(2)(xxviii) (*.260) did not violate Neals's due process rights.

IV.

We turn next to Neals's contention that the hearing officer's decision was not supported by substantial evidence. As we have noted in Blanchard, substantial evidence is defined as "such evidence as a reasonable mind might accept as adequate to support a conclusion," and "evidence furnishing a reasonable basis for the agency's action." 461 N.J. Super. at 239 (quoting Figueroa, 414 N.J. Super. at 192); see also N.J.A.C. 10A:4-9.15(a) ("A finding of guilt at a disciplinary hearing shall be based upon substantial evidence that the inmate has committed a prohibited act.").

A-2344-20

The record indicates that DOC staff verbally informed Neals that testing was mandatory prior to his refusal and charging him with prohibited act *.260. Neals was counseled regarding the purpose of mandatory testing as well as the consequences of his refusal. The record shows that when Nurse Frederic-Caldwell went to Neals's housing wing later that day to administer the test, Neals refused to submit to testing. The record reflects that Neals signed a refusal form. This evidence amply establishes the violation.

Finally, we address Neals's argument that he did not outright refuse to submit to the COVID-19 test, but instead sought to consult with his attorney prior to deciding whether to submit to the testing. We agree with DOC that Neals did not have a right to consult with counsel prior to submitting to testing. Neals cites no authority for the proposition that he had any such right to confer with counsel. We add that such consultations would entail a delay in administering COVID-19 tests that would frustrate the purpose of testing. Neals was properly advised that he had no authority to refuse to submit to COVID-19 testing and nonetheless refused to comply, as clearly evidenced by the refusal form he signed.

A-2344-20

To the extent we have not addressed them, any remaining contentions raised by Neals lack sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

Affirm.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2344-20